Electronically FILED by Superior Court of California, County of Los Angeles on 05/02/2019 07:24 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Clifton,Deputy Clerk
19STCV15497

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Stephanie Bowick

1  DONNA BULLOCK, Esq.
2  Attorney at Law (SBN 109223)
   800 W. 6th St., Ste. 1250
3  Los Angeles, CA 90017
4  Tel: (562) 726-0778
   Fax: (562) 683-0319
5  donnabullockcarrera@yahoo.com
6
   Attorney for Plaintiff MICHAEL DOUGLAS CARLIN
7
8                SUPERIOR COURT OF CALIFORNIA
9                  COUNTY OF LOS ANGELES

10  MICHAEL DOUGLAS CARLIN,          | Case No.
11              Plaintiff,           |
12        v.                         | **VERIFIED COMPLAINT FOR:**
13  FGW PRODUCTIONS LLC, a Nevada    | **(1) UNFAIR COMPETITION;**
    Limited Liability Company; FGW   |
14  PRODUCTIONS INC., a California   | **(2) BREACH OF ORAL
    corporation; FGW Entertainment, Inc., | CONTRACT;**
15  a California corporation; STEPHANIE |
    FREDERIC, an individual;  SIMONA | **(3) BREACH OF WRITTEN
16  MANGIANTE PAPDOPOULOS, an        | CONTRACT;**
    individual;  DOES 1 to 50, Inclusive, |
17                                   | **(4) BREACH OF IMPLIED
              Defendants.            | CONTRACT;**
18                                   |
                                     | **(5) INTERFERENCE WITH
19                                   | EXISTING CONTRACT AND
                                     | ECONOMIC RELATIONS;**
20                                   |
                                     | **(6) BREACH OF CONFIDENCE**
21                                   |
                                     | **(6) FRAUD – PROMISE MADE
22                                   | WITHOUT THE INTENT TO
                                     | PERFORM**
23                                   |
                                     | **(7) FRAUD – INTENTIONAL
24                                   | MISREPRESENTATION**
25                                   | **(9) INJUNCTIVE RELIEF**
26                                   | **(10) ACCOUNTING**
27  COMES NOW Plaintiff MICHAEL DOUGLAS CARLIN for causes of
28  action against Defendants as follows:

                                1
                           COMPLAINT

1.     Plaintiff MICHAEL DOUGLAS CARLIN ("CARLIN") is an individual residing in and doing business in the County of Los Angeles, State of California.  CARLIN is an artist, writer, producer and creator of film and television productions.

2.     Defendant FGW Productions LLC (sometimes hereinafter referred to as "FGW") is an active Nevada limited liability company, established on September 23, 2013 with the State of Nevada, Nevada Business Identification Number NV20131561539, Nevada Entity No. E0459962013-6, located at 2620 Regatta Drive, Suite 102, Las Vegas, Nevada 89128, whose managing member is Stephanie Frederic.

3.     Defendant FGW Productions, Inc. is a Suspended California corporation, registered on January 7, 2002, and which has been suspended and not qualified to conduct business since in or about 2008, with offices at 10445 Wilshire Blvd, Suite 702, Los Angeles, California 90024, with its Defendant Stephanie Frederic as its agent for service of process.

4.     Defendant FGW Entertainment, Inc. is another Suspended California corporation, which has been suspended and not qualified to conduct business since August 5, 2016, with offices at 10445 Wilshire Blvd, Suite 702, Los Angeles, California 90024, with its Defendant Stephanie Frederic as its agent for service of process.  (Defendant FGW Productions, Inc., and FGW Entertainment, Inc., are sometimes hereinafter referred to as the "Corporations")

5.     Defendant Stephanie Frederic ("Frederic") is an individual, whose personal residence is unknown, but who conduct all business and activities of the subject Production through FGW and/or the Corporations.  Frederic is a principal, manager, owner, authorized agent, officer, director or otherwise responsible for the liabilities and obligations of FGW and/or the Corporations as hereinafter alleged.

6.     Defendant Simona Mangiante-Papadopoulos ("Papadopoulos") is an individual whose personal residence is unknown, and who entered into a written

-1-

COMPLAINT

1   Agreement with CARLIN, thereafter having engaged in business and activities of
2   the subject Production through Defendants Frederic, FGW, the Corporations and
3   Does 1-50 Inclusive.

4         7.    CARLIN is ignorant of the true names and capacities of the Defendants
5   herein sued as Does 1 to 50, inclusive, and therefore sues these Defendants by these
6   fictitious names.  Plaintiff will amend this complaint to allege their true names and
7   capacities when ascertained.

8         8.    CARLIN is informed and believes, and therefore alleges, that at all
9   times herein mentioned each defendant was the agent, servant, employee, and/or co-
10  conspirators, each of the remaining defendants, and in doing the things hereinafter
11  alleged, was acting in the course and scope of such authority as such agent, servant,
12  employee and/or co-conspirator, and with the permissions, consent, knowledge or
13  ratification of each of the other defendants.

14        9.    CARLIN is informed and believes, and therefor alleges that as between
15  Frederic and FGW, and also as between Frederic and the Corporations, there each
16  existed a unity and identity of interests between the individual, on the one hand, and
17  the Corporations and the LLC on the other, such that adherence to the fiction of the
18  separate existence of the business entity should be disregarded as it would sanction
19  fraud and promote justice.

20  **Factual Background**

21        10.    CARLIN is the co-creator of a reality/docuseries television production,
22  tentatively entitled alternatively "Crossfire Hurricane" or "Simona & George
23  Papadopoulos" ("Production"), the scope of which was to detail the events in the
24  Trump campaign that led to appointment of a Special Counsel and how these events
25  impacted the lives of George and Simona Papadopoulos.

26        11.    CARLIN signed a written Agreement with Defendant Simona
27  Mangiante-Papadopoulos ("Papadopoulos") on October 31, 2018 to produce a
28  documentary, that became the basis for this show.  CARLIN and Defendant

-2-

1 | Papadopoulos signed this written agreement for the gross proceeds of the Production
2 | to be split between them on an equal basis. This Agreement made CARLIN a 50%
3 | equity owner of all revenue from distribution of the Production, with anticipated
4 | revenue shared with agents and producers to be paid from CARLIN's share of the
5 | Production gross proceeds. All Defendants in this action, specifically Defendant
6 | Frederic, FGW and the Corporations, and all persons acting on their behalf, were
7 | directly informed by CARLIN and had actual notice of the terms and existence of
8 | this written Agreement between CARLIN and Defendant Simona Papadopoulos,
9 | specifically including the fact that he owned a 50% equity share in the Production.
10 | Each Defendant was informed of this Agreement, agreed to pay his rightful share
11 | and voluntarily accepted the disclosures of the components of the Production by
12 | CARLIN as hereinafter described, as well as his exclusive work on the Production
13 | before and during filming of episodes. A true and correct copy of this Agreement is
14 | attached hereto, marked as Exhibit "A" and incorporated herein by this reference.

15 |      12.    The Production included an original work by CARLIN with contractual
16 | rights, introduction of the parties each to each other, and other components
17 | described below, consisting of, comprised of, incorporating, planning to distribute
18 | the intended media release of the finished Production. CARLIN would never have
19 | disclosed or shared any of the following with Defendants Frederic, FGW, the
20 | Corporations or Does 1 to 50, Inclusive, except in a bargained for exchange for a
21 | promise by each of the Defendants to give him his equity share of 50% of the net
22 | profits or the reasonable equivalent thereof as stated in his original Agreement with
23 | Defendant Papadopoulos (Exhibit "A"), to pay him for the work he actually did in
24 | furtherance of the Production while under the control of Defendants Frederic, FGW
25 | and the Corporations during filming and through the future release of the
26 | Production, all of which CARLIN was actually promised by Defendants Frederics,
27 | FGW and the Corporations as hereinafter alleged, and on behalf of all defendants
28 |

-3-

named herein.  The components of the Production were disclosed to Defendants by CARLIN and which included, but were not limited to each of the following:

    a. A verbal description of a written treatment of the Production, bearing a copyright notification, consisting of over 100 pages of a work of original authorship, incorporating research, for which CARLIN devoted months of work and personal time, effort and expense to create.  The contents of this treatment were verbally communicated to the Defendants during the scope of his involvement with the Production and incorporated into the series episodes which have been filmed and are intended to be filmed;

    b. A video introduction to the Production created by CARLIN;

    c. A thumbdrive of interview questions and information actually used by Defendants FGW Productions, LLC and Stephanie Frederic incorporated into the actual filming and production of the Production;

    d. The written Agreement between CARLIN and Defendant Simona Papadopoulos;

    e. A research treatise of the media events involving the Production;

    f. A video clip collection derived from media research, created and maintained by CARLIN;

    g. The actual work by CARLIN at the filming of the Production in Los Angeles, Illinois and Wisconsin;

    h. The actual work by CARLIN in the development of the episodes actually filmed;

    i. The personal expenses incurred, and the income lost in the inability to perform other work, by CARLIN to participate in the pre-filming, the filming and all other activities for this

1  Production at the direction and request of Defendants Frederic,

2  FGW and the Corporations;

3      j. The Shopping Agreement which was signed by George

4  Papadopoulos and Defendant Simona Papadopoulos, which

5  CARLIN alone obtained for the Production at the request of

6  Defendants Frederic, FGW and the Corporations;

7      k. And other tangible medium created, prepared and maintained by

8  CARLIN for the Production, and provided to the Production at

9  the specific instance and request of all Defendants.

10      13.    CARLIN and Defendant Simona Papadopoulos pitched the Production

11  to Entertainment Executive Chris Nassif on November 9, 2018. Subsequent to

12  Nassif passing on the project, CARLIN pitched the Production to Defendant

13  Stephanie Frederic.  Defendant Stephanie Frederic is the person to whom the

14  Production was proposed, and which CARLIN is informed and believes that

15  Defendants, and each of them, actually thereafter misappropriated the entire

16  Production.  The contract later rejected by CARLIN came from FGW Productions,

17  LLC (the Nevada entity).

18      14.    However, although not qualified to do business in any state, the

19  Corporations was a name associated with the payment activities of the Production.

20  CARLIN lacks information and belief as to the relationship of the several business

21  entities used by Defendant Frederic for funding of the filming of the production.

22  Defendants FGW, Frederics and the Corporations sent over to CARLIN an

23  exclusive Shopping Agreement and asked CARLIN to get George Papadopoulos

24  and Simona Mangiante to sign this agreement.  CARLIN developed the strategy and

25  alone took all action required to get this Shopping Agreement signed by Defendant

26  Papadopoulos, obtained her signature and provided it to Defendants Frederics, FGW

27  and the Corporations.  A true and correct copy of the Shopping Agreement signed

28

COMPLAINT

1   by George and Simona Papadopoulos is attached hereto, marked as Exhibit "B" and
2   incorporated herein by this reference.

3        15.     CARLIN is informed and believes, and thereon alleges, that Defendants
4   Frederic, FGW, the Corporations and Does 1 to 50 Inclusive, used the components
5   of the Production provided to Defendants by CARLIN.  Defendants secured
6   financing and other contractual commitments necessary to start production and
7   filming all under the authority of the Shopping Agreement procured by CARLIN at
8   said Defendants' instance and request, without which no business activities could
9   have been commenced by Defendants for this Production.  CARLIN was involved
10  in all activities expected and requested of him to enable the remaining Defendants to
11  take all necessary to start filming, including but not limited to disclosure of all
12  components of the Production, traveling to the filming locations, participating in the
13  staging of episodes, and performing all work requested of him by the Defendants,
14  and each of them.  CARLIN introduced Defendant Papadopoulos to Defendants
15  Frederic, FGW and the Corporations, without which Defendants could not have
16  started any of the activities required for the Production which CARLIN is informed
17  and believes is about to be released to the general public without the promised
18  agreement for his compensation for the Production he provided to them, which he
19  created and developed and which he worked upon all based upon ongoing and
20  express promises by each of the Defendants for his compensation for work actually
21  performed by him, as well as his rightful 50% net profit share in the planned
22  Production.  CARLIN's disclosure of the components of the Production to
23  Defendants, introductions of the parties to each other, and all actual work and
24  contractual rights shared were only disclosed to each Defendants as consideration of
25  a promise of each Defendant to pay him (1) his share of the profits and (2)
26  compensation for his actual work done.  Defendants, and each of them, did agree
27  and assent to compensate CARLIN for his sharing of the components of CARLIN's
28  production, securing the contracts required and introducing the parties together, each

-6-

1  voluntarily accepting the benefit of his work and his disclosure and sharing of the
2  components of his Production, and made no statements or take any action to indicate
3  any intent other than promises to compensate CARLIN for all of his work and to
4  pay him his rightful share in the net profits of the Production upon general release.
5      16.   After commencement of filming, Frederic, FGW, the Corporations and
6  Does 1-50, separately and in collusion with each other and other individuals and/or
7  co-conspirators attempted to push CARLIN out of the project.  These Defendants
8  knew of his Agreement with Defendant Simona Papadopoulos and his 50% equity
9  share in the Production, and his intellectual property rights in the entire Production
10  and all components thereof.  This was a collaborated effort to steal all material and
11  the elements of the Production from CARLIN, to avoid paying him for his work and
12  for his rights and for the components of his Production.  Defendants Frederic, FGW
13  and the Corporations, and Does 1 to 50 Inclusive did so with the intent to harm
14  CARLIN, whom defendants knew to be of limited personal resources and who had
15  been working on the Production during its pre-filming and filming activities without
16  the compensation promised him by the Defendants.
17  **FACTUAL ALLEGATIONS COMMON TO EACH CLAIM FOR RELIEF**
18      17.   CARLIN contacted Defendant Frederic and pitched the show on
19  November 12, 2018. Defendant Stephanie Frederic either individually or on behalf
20  of her various business entities including but not limited to FGW and the suspended
21  Corporations, expressed interest and asked for CARLIN to arrange a meeting and
22  get a Shopping Agreement signed. Defendant Frederic stated her agreement to make
23  CARLIN a producer on the show prior to meeting or the Shopping Agreement being
24  signed, and to honor his Agreement with Defendant Papadopoulos for this equity
25  share in the gross proceeds of the Production.  At this first contact, at the subsequent
26  meetings and at all times, CARLIN fully and clearly stated and Defendant Frederic
27  apparently acting on behalf of FGW and the Corporations, stated her full and clear
28  understanding that sharing of all components of the Production was in confidence,

-7-

COMPLAINT

1    and that CARLIN would be reasonably compensated for its use by Defendants for

2    the show under the terms of CARLIN's Agreement with Defendant Papadopoulos

3    (Exhibit "A") as well as for his work and other contributions to the show.

4        18.    Defendant Frederic texted CARLIN, "We gotta make this happen," "I

5    need an exclusive shopping agreement," "Can you help." CARLIN replied "yes."

6    CARLIN then texted Defendant Frederic, "OK, what agency are you repped by?"

7    Defendant Frederic responded, "ICM." CARLIN wrote back, "Perfect! That is a

8    great marquis name we can use to close this." Defendant Frederic then emailed over

9    the Shopping Agreement to CARLIN.  Defendant Frederic texted CARLIN,

10   "Reading up on them, very interesting." CARLIN replied, "I know the good and

11   bad, they are characters out of comic books, very interesting television, I will bring

12   some interesting stories that are not generally known."

13       19.    On November 12, 2018, CARLIN met with three representatives of

14   FGW at the lobby of ICM, including Defendant Frederic and two individual named

15   Greg and Leah. They discussed the strategy to get the Shopping Agreement signed.

16   At 4:15 George and Simona Papadopoulos arrived and CARLIN got them to sign

17   the Agreement. Defendants FGW, Frederic and the Corporations had never before

18   met and had no relationship or access to George and Simona Papadopoulos before

19   this meeting arranged by CARLIN.  Upon signing the group all moved up to a

20   meeting at ICM where the show was pitched to the Agency.

21       20.    CARLIN delivered the Papadopoulos couple to a meeting inside the

22   lobby of ICM, at 10250 Constellation Blvd, Century City, CA 90067. Prior to this

23   meeting CARLIN disclosed to the FGW team how he had signed Simona to his

24   Agreement and its terms by which he owned a 50% equity share in the Production,

25   which they acknowledged. He then walked them through how the team was going to

26   close this deal. When the Papadopoulos couple arrived, CARLIN walked the

27   Papadopoulos' over to the team, and the plan to get them to sign the Exclusive

28   Shopping Agreement commenced and the Shopping Agreement was signed. The

-8-

1   entire group (Simona Papadopoulos, George Papadopoulos, CARLIN, Defendant

2   Frederic with her team members Greg and Leah) all proceeded to a meeting upstairs

3   to pitch the show to ICM.

4        21.   CARLIN was very prominent in that confidential pitch meeting

5   suggesting many aspects of the show that have been incorporated into the current

6   version of the show. Upon leaving that meeting Defendant Frederic leaned into

7   CARLIN and said, "we are rich, we will make a lot of money."

8        22.   ICM was  unable to pre-sell the show on a tight timeframe, however,

9   Defendant Frederic stated to CARLIN that Netflix and BBC are interested in

10  picking up the show.

11       23.   On November 19, 2018 CARLIN texted Defendant Frederic, "Got a

12  great angle for one episode." Defendant Frederic responded, "start sending over…

13  gonna (sic) have you and Leah crafting episodes." CARLIN delivered to Defendant

14  Frederic a thumbdrive with interview questions for the first episode also containing

15  other items comprising the Production, all requested by and on behalf of Defendant

16  Frederic, which she said she was going to disseminate to the rest of the crew.

17       24.   Defendant Frederic subsequently found outside funding for the show

18  and on November 21, 2018 Defendant Frederic texted CARLIN saying, "I will

19  announce tonight. We're moving forward. Greenlight."

20       25.   On November 23, 2018 CARLIN and Defendant Frederic had a

21  conversation confirming that CARLIN was a partner in the show.  CARLIN asked

22  Defendant Frederic directly "Is this your show, or is this our show" to which she

23  replied to CARLIN "This is our show,"  confirming the understanding that CARLIN

24  and the remaining Defendant were partners in this show, and that the Agreement

25  between CARLIN and Defendant Simona Papadopoulos would be honored as to his

26  50% equity share in the production gross proceeds, as well as for CARLIN's

27  compensation for his services actually performed for the production.

28

COMPLAINT

1    26.    On November 23, 2018, FGW promised CARLIN, Simona and George

2  that they would have contracts by tomorrow. That time passed and no contracts were

3  presented to either CARLIN, George or Simona.

4    27.    Defendants flew CARLIN, George, & Simona to Chicago on

5  November 24th upon the direct request of Defendant Frederic apparently acting on

6  behalf of the remaining Defendants.  Again, there was a promise of contracts but no

7  contracts ever appeared.  The contracts promised by Defendant Frederic were that

8  CARLIN would receive a final equity percentage from the gross proceeds from

9  distribution of the Production in accordance with his 50% equity share under the

10  Agreement with Defendant Simona Papadopoulos, with a Producer credit on the

11  Production, and the terms of the final division of the gross proceeds of the

12  Production between CARLIN and FGW to be stated in writing and payment for

13  services performed by CARLIN for Defendants on the show.

14    28.    CARLIN was starting to be frozen out of having anything to do with

15  the creative on this project. CARLIN was instructed by Defendant Frederic to

16  wrangle both George and Simona, facilitate the Production, and he executed all

17  duties requested and required of him, and all work necessary for the Production

18  itself for which he was promised and expected pay and compensation for time spent

19  and expenses incurred.

20    29.    On November 26, 2018 CARLIN was in George and Simona's room as

21  the film crew filmed and both George and Simona started to quarrel. CARLIN was

22  asked by FGW representative Leah to leave the set. He responded sternly that he

23  was there to help "his friends" settle their differences as they were preparing to

24  leave to take George Papadopoulos to the Federal Correction Institute in Oxford,

25  Wisconsin, to surrender for his prison sentence.  Defendant Frederic had requested

26  that CARLIN drive the Papadopoulos' to the prison with the film crew, to film their

27  'goodbye.' CARLIN was directly involved with the filming of this critical scene for

28  the show.  Thereafter, Defendants FGW and Frederic used this as an excuse which

-10-

1  was a pretext for CARLIN to be banned from further filming as FGW representative

2  Leah claimed she was now "afraid," rather than resolving the claimed problem.

3  This was a staged manipulation by Defendants to keep CARLIN out of the

4  production process after disclosure of CARLIN's confidential intellectual properties

5  and other components of the Production, and his work had already been done, as

6  described hereinabove.

7       30.    Subsequently, CARLIN asked about the agreement promised by

8  Defendant Frederic, under which he worked on the production and disclosed his

9  confidential intellectual property rights.  CARLIN put Defendants through

10 Defendant Frederic through a representative of Defendants, in touch with his

11 representative, Chris Nassif to negotiate his contract.

12      31.    The contract was presented to CARLIN on November 30th and did not

13 reflect the understanding that FGW had with CARLIN by which CARLIN disclosed

14 to Defendants his confidential ideas and rights to the Production. The offer stripped

15 him of any creator credit for creating the show, offered him a co-executive producer

16 credit, and no money for the actual work he did and expenses he incurred to do that

17 work, even though he had been working full time on the project since October 31,

18 2018.  No mention of his rightful 50% equity share in the Production was

19 mentioned.  No money from the gross proceeds of the distribution of the Production

20 , no revenue and no compensation or payment for CARLIN's equity interest in the

21 Production as promised was included.  Only a $50 per day per diem was mentioned

22 and a percentage not reasonably equivalent to his rightful share under the

23 Agreement with Defendant Papadopoulos (Exhibit "A") of which all Defendants,

24 and each of them, were directly informed by CARLIN.  This contract, was never

25 mentioned or agreed to by CARLIN in any discussions or negotiations by or on

26 behalf of any defendant.  A true and correct copy of this unsigned contract is

27 attached hereto, marked as Exhibit "C" and incorporated herein by this reference.

28

COMPLAINT

1       32.   On December 3rd, CARLIN was advised that he was being sent to

2   California with Simona and one other FGW representative. That was a ploy to get

3   CARLIN off of the Wisconsin set. When Simona and the FGW representative

4   returned to Wisconsin, CARLIN was not included. FGW representatives were

5   instructed not to provide CARLIN with any information on locations, times, or

6   dates.

7       33.   CARLIN has been frozen out of the production that he created. All

8   communication between CARLIN and Defendants Frederic, FGW, or any of the

9   Corporations or their representatives has ceased.

10      34.   Defendants, and each of them, directly and through third parties acting

11  on their behalf, and including public statements by George Papadopoulos, have

12  made, disseminated and/or represented to the general public that the Production

13  derived by Defendants from CARLIN is about to be released, which specifically

14  incorporates the components, contract rights, ownership rights, work and intellectual

15  properties disclosed and shared by CARLIN with each of the Defendants. The

16  Defendants have benefitted and could never have effectuated any of the intended

17  media about to be released without the valuable intellectual properties, contract

18  rights, work and services provided and performed by CARLIN for this Production in

19  pre-production, pre-filming, during filming, and at all other times used by

20  Defendants for their benefit.

21      35.   CARLIN is the owner of the copyrights in the Production, under all

22  applicable state law and any federal law protections, and under the contract between

23  the parties at all times relevant hereto, which intellectual properties were

24  confidential and not disclosed except upon a promise of payment upon Production

25  for work, and for his share under the Agreement with Defendant Papadopoulos

26  (Exhibit "A"), communicated and known to all Defendants. CARLIN's treatment,

27  his research treatment and all tangible intellectual properties were clearly marked

28  with a copyright symbol providing notice of CARLIN's exclusive rights thereto.

-12-

36.     CARLIN is informed and believes, and on that basis alleges, that defendants made profits and have been unjustly enriched by reason of their infringement of CARLIN's copyrights in the Production and use of his confidential ideas, proprietary information and contacts with the talent, and all other components of the production as well as his own actual work and services at the special instance and request of all Defendants, as herein alleged, voluntarily accepted by said Defendants to their benefit.

## FIRST CLAIM FOR RELIEF

### (Unfair Competition Against Defendants, and each of them)

37.     CARLIN realleges and incorporates by reference the allegations contained in Paragraphs 1 through 36, inclusive, as though fully set forth herein.

38.     This is a claim for unfair competition in violation of California Business and Professions Code §§ 17200, *et seq.*, and the common law of the State of California.

39.     CARLIN invested substantial time, skill, and money in developing his copyrighted materials, creation of his confidential ideas and developing his contractual rights in the Production. CARLIN was asked at the special instance and request of Defendants, and each of them, to perform services, and was prevented from engaging in other work while incurring expenses upon the expectation of compensation as well as payment for the Production ideas disclosed to Defendants. Defendants appropriated and used CARLIN's copyrighted works, components of the production and his services, at little or no cost to defendants despite their promises of payment and compensation. Defendants' appropriation and use of CARLIN's property was without the authorization or consent of CARLIN. The actions of defendants have resulted in business loss and injury to CARLIN.

40.     Defendants' actions constitute unlawful, unfair, malicious or fraudulent business practices in violation of California Business and Professions Code §§ 17200, *et seq.*, and the common law of the State of California.

-13-

41.     CARLIN is informed and believes, and on that basis alleges, that defendants have made profits and have been unjustly enriched by reason of their infringement of CARLIN's copyrights in the Production, use of his confidential ideas and in derogation of his contractual rights.

42.     As a direct consequence of defendants' aforementioned acts, CARLIN has been damaged in an amount according to proof.

43.     As a direct consequence of defendants' aforementioned acts, CARLIN's ability to generate revenue by licensing the Production has been greatly impaired.

44.     As a direct consequence of defendants' aforementioned acts, CARLIN's reputation has been damaged.

45.     As a direct consequence of defendants' aforementioned acts, CARLIN has suffered, and will continue to suffer, irreparable injury.  Such damage and irreparable injury will continue and will increase unless and until defendants are enjoined from their wrongful acts.

46.     Defendants' willful acts of unfair competition constitute fraud, oppression and malice.  Accordingly, CARLIN is entitled to recover exemplary damages pursuant to California Civil Code § 3294(a).

## SECOND CAUSE OF ACTION

### (Breach of Oral Contract Against Defendants FGW, Frederic, Corporations and Does 1 to 50, Inclusive)

47.     CARLIN realleges and incorporates by reference the allegations in paragraphs 1 through 46, inclusive, as though fully set forth herein.

48.     CARLIN on the one hand, and Defendants through Defendant Frederic apparently acting on behalf of the remaining defendants on the other hand, entered into a verbal agreement, as described above.  CARLIN gave these Defendants access to the Production, to George and Simona Papadopoulos, and all of CARLIN's confidential information, research, ideas and used his contractual rights,

-14-

1   after which Defendants took the Production, all of its components, all intellectual

2   property associated therewith, and actually commenced filming and work on the

3   Production using CARLIN to do so without any of the promised payment.

4        49.   CARLIN performed all conditions, covenants and promises required on

5   his part to be performed in accordance with his agreements and the requests by and

6   on behalf of FGW, as well as work on the intellectual properties and services

7   performed for Defendants relating to the Production.

8        50.   Defendants Frederic, FGW, the Corporations and Does to 50 Inclusive,

9   breached the agreement by undertaking the actions described above to take over thes

10   show, without CARLIN's permission by refusing to pay him to use of the

11   components of the Production, his intellectual properties, his contract rights, or to

12   compensate him for his services or expenses incurred.

13        51.   Defendants Frederic, FGW, the Corporations and Does to 50 Inclusive

14   breaches of the oral agreement are ongoing, and unless they are enjoined by this

15   Court, Defendants Frederic, FGW, the Corporations and Does to 50 Inclusive will

16   continue to disclose, use and/or exploit the Production without keeping their

17   promises to compensate him, or to pay him for his services, all without CARLIN's

18   permission in violation of the nondisclosure agreement.

19        52.   As a direct and proximate result of Defendants Frederic, FGW, the

20   Corporations and Does to 50 Inclusive breaches described herein, CARLIN has

21   suffered irreparable damages, including lost profits, and CARLIN will continue to

22   suffer irreparable damages in amounts to be proven at trial.

23        53.   CARLIN is entitled to a permanent injunction restraining FGW and its

24   officers, agents and employees and all persons acting in concert with them from

25   engaging in any further actions in violation of CARLIN's rights under the

26   agreement.

27       //

28       //

**THIRD CAUSE OF ACTION**

**(Breach of Implied Contract Against Defendants FGW, Frederic,**

**Corporations and Does 1 to 50, Inclusive)**

54.     CARLIN realleges and incorporates by reference the allegations in paragraphs 1 through 46, inclusive, as though fully set forth herein.

55.     CARLIN and defendants formed an implied-in-fact contract by their course of conduct described above.

56.     CARLIN presented the Production to Defendants Frederic, FGW, the Corporations and Does to 50 Inclusive, consistent with well-established customs and practices in the entertainment industry and on the mutually understood condition and bilateral expectation that defendants would not disclose, use and/or exploit the Production without CARLIN's permission and/or without compensating CARLIN in the form of payment, credit and other consideration to CARLIN.  CARLIN presented all components of the Production in confidence to Defendants FGW, Frederic, Corporations and all persons acting on their behalf including but not limited to Does 1 through 50, Inclusive.

57.     CARLIN told Defendants, and each of them, directly or indirectly, that his ideas were confidential and could be used only if he were compensated.  Also, the disclosures to Defendant, and each of them, were done under the well-established customs and practices of the entertainment industry and on the mutually understood condition and bilateral expectation that defendants would not disclose, use and/or exploit the Production without CARLIN's permission and/or without compensating CARLIN in the form of payment, credit and other consideration to CARLIN, that CARLIN's Agreement with Defendant Papadopoulos would be observed and would not be breached or interfered with, and defendants' actions and conduct implied and led CARLIN to reasonably believe that defendants would not disclose, use and/or exploit any part of the Production or disclose the show to the general public without CARLIN's permission and/or without compensating

-16-

1  CARLIN in the form of payment, credit and other consideration to CARLIN as
2  promised.
3      58.   CARLIN performed all conditions, covenants and promises required on
4  his part to be performed in accordance with the terms and conditions of his implied-
5  in-fact contract with defendants.
6      59.   Defendants breached the implied-in-fact contract by undertaking the
7  actions described above to take over the show, without CARLIN's permission
8  and/or without compensating CARLIN in the form of payment, credit and other
9  consideration to CARLIN as promised or as stated under the Agreement with
10  Defendant Papadopoulos (Exhibit "A").
11      60.   Defendants' breaches of the implied-in-fact contract are ongoing, and
12  unless defendants are enjoined by this Court, defendants will continue to disclose,
13  use and/or exploit the Production without CARLIN's permission and/or without
14  compensating CARLIN.
15      61.   As a direct and proximate result of defendants' breaches described
16  herein, CARLIN has suffered irreparable damages, including lost profits, and
17  CARLIN will continue to suffer irreparable damages in amounts to be proven at
18  trial.
19      62.   CARLIN is entitled to a permanent injunction restraining defendants
20  and their officers, agents and employees and all persons acting in concert with them
21  from engaging in any further actions in violation of CARLIN's rights.
22      63.   Defendants' conduct was malicious, fraudulent, oppressive and
23  intended to injure CARLIN.  Consequently, CARLIN is entitled to an award of
24  punitive damages.

**FOURTH CLAIM FOR RELIEF**

**(Breach of Written Contract Against Defendant Papadopoulos)**

27      64. CARLIN realleges and incorporates by reference the allegations in
28  paragraphs 1 through 46, inclusive, as though fully set forth herein.

-17-

COMPLAINT

65.   CARLIN and Defendant Simona Papadopoulos entered into a written Agreement, for a 50% equity share in the gross proceeds of the Production, as described above.  Defendants Frederic, FGW, the Corporations and Does 1 through 50, Inclusive, obtained their rights, if any, from Defendant Papadopoulos of which CARLIN already owned a 50% equity share.

66.   CARLIN performed all conditions, covenants and promises required on his part to be performed.

67.   CARLIN is informed and believes that Defendant Simona Papadopoulos has breached the agreement by failing to honor the 50% equity share in the Production with CARLIN, undertaking the actions described above, without CARLIN's permission.

68.   As a direct and proximate result of Defendant Simona Papadopoulos' breaches described herein, CARLIN has suffered irreparable damages, including lost profits, and CARLIN will continue to suffer irreparable damages in amounts to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### (Interference with Existing Contract and Economic Relations Against Defendants FGW, Frederic, Corporations and Does 1 to 50, Inclusive)

69.   CARLIN realleges and incorporates by reference the allegations in Paragraphs 1 through 68, Inclusive, as though fully set forth herein.

70.   There was and is an existing written Agreement between CARLIN and Defendant Papadopoulos for CARLIN's 50% equity share in the gross proceeds of the Production, for which there is a probability of future economic benefits to CARLIN upon the distribution of the Production.

71.   Defendants FGW and Stephanie Frederic knew of the existence of that Agreement, were given access to the Production and all of its components listed above in confidence by CARLIN, as well as being introduced by CARLIN to

-18-

1  George and Simona Papadopoulos for said Production, all through Defendant's use
2  of CARLIN and his rights in and to the Production.

3     72.    Defendant Frederic, FGW, the Corporations and Does 1 to 50
4  Inclusive, each intentionally interfered with the relationship between CARLIN and
5  Defendant Simona Papadopoulos, to take and deprive him of his contract rights and
6  his rightful 50% equity share in the gross proceeds of the Production;  used his
7  original works, services, contacts, and all related items to create the Production,
8  actually having CARLIN work at the filming of the Production, and only after
9  filming was well underway did intentionally misappropriate the Production from
10 CARLIN, and actually disrupting his economic relationship under that Agreement
11 with Simona Papadopoulos.  Defendants FGW, Frederic, Corporations and Does 1
12 to 50, Inclusive, actually excluding CARLIN from the Production activities after
13 using his rights, and taking the Production for themselves, without his consent,
14 without compensation for past work and without any provision for his rightful
15 equity share in the gross proceeds of the Production.

16    73.    As a direct and proximate result of Defendant Simona Papadopoulos'
17 breaches described herein, CARLIN has suffered irreparable damages, including
18 lost profits, and CARLIN will continue to suffer irreparable damages in amounts to
19 be proven at trial.

20    74.    These actions by Defendants Frederic, FGW, the Corporations and
21 Does to 50 Inclusive against CARLIN were intentional, malicious, oppressive,
22 fraudulent, and for which CARLIN is entitled to an award of punitive damages in an
23 amount to be determined at trial in this matter.

24                    **SIXTH CLAIM FOR RELIEF**
25       (**Breach of Confidence -** Against Defendants FGW, Frederic, Corporations
26                    and Does 1 to 50, Inclusive)

27    75.    CARLIN realleges and incorporates by reference the allegations
28 contained in Paragraphs 1 through 46, Inclusive as though fully set forth herein.

-19-

76. CARLIN and defendants formed confidential relationship by their course of conduct described above, upon which CARLIN came to repose trust and confidence in Defendants, and each of them, that they would keep their promises, and would not abuse or misuse the confidential ideas, intellectual properties, and other components of the Production provided to Defendants by CARLIN. CARLIN had no reason to suspect that Defendants, and each of them, would take the Production and refuse to pay him as they promised, or would exhibit the show to the public after excluding him.

77. CARLIN presented the Production to defendants, and each of them, in confidence, in confidential and private communications and at closed business meetings wherein he disclosed in confidence the Production, which had never before been disclosed to the public. CARLIN's conduct was consistent with well-established customs and practices in the entertainment industry, and on the mutually understood condition and bilateral expectation that defendants would not disclose, use and/or exploit the Production without CARLIN's permission and/or without compensating CARLIN in the form of payment, credit and other consideration to CARLIN under the terms of his Agreement with Defendant Papadopoulos (Exhibit "A") and compensating him for work actually performed on the production as promised. The terms of his Agreement with Defendant Papadopoulos and his requests for compensation for production services was disclosed to Defendants FGW, Frederic and the Corporations also in confidence.

78. Defendants, and each of them, accepted the confidential disclosure of CARLIN's ideas, and all other components of the Production provided by him, knowing these were presented in confidence, which was in accordance with the manner generally accepted under the well-established customs and practices of the entertainment industry and on the mutually understood condition and bilateral expectation that defendants would not disclose, use and/or exploit the Production without CARLIN's permission and/or without compensating CARLIN in the form

-20-

1  of payment, credit and other consideration to CARLIN as hereinabove alleged and
2  as promised.  The conduct of Defendants, and each of them, and their actions,
3  promises and assurances, was conduct which implied and which led CARLIN to
4  reasonably believe that defendants would not disclose, use and/or exploit the
5  Production without CARLIN's permission and/or without compensating CARLIN in
6  the form of payment, credit and other consideration to CARLIN as hereinabove
7  alleged, under the terms of his Agreement with Defendant Papadopoulos (Exhibit
8  "A") and for services he actually performed at the request of Defendants for this
9  show.

10       79.   CARLIN performed all conditions, covenants and promises required on
11  his part to be performed in accordance with the terms and conditions of his
12  confidential relationship with defendants.

13       80.   Defendants breached the confidential relationship with CARLIN by
14  undertaking the actions described above to take over the show, refusing to pay him,
15  freezing him out of filming after they got all of the Production components from
16  him and the benefit of his services, without CARLIN's permission and/or without
17  compensating CARLIN in the form of payment, credit and other consideration to
18  CARLIN and without performing any of their promises to him.

19       81.   Defendants' breaches of the confidential relationship with CARLIN are
20  ongoing, and unless defendants are enjoined by this Court, defendants will continue
21  to disclose, use and/or exploit the Production without CARLIN's permission and/or
22  without compensating CARLIN.

23       82.   As a direct and proximate result of defendants' breaches of the
24  confidential relationship described herein, CARLIN has suffered irreparable
25  damages, including lost profits, and CARLIN will continue to suffer irreparable
26  damages in amounts to be proven at trial.

27

28

COMPLAINT

83. CARLIN is entitled to a permanent injunction restraining defendants and their officers, agents and employees and all persons acting in concert with them from engaging in any further actions in violation of CARLIN's rights.

84. Defendants' conduct was malicious, fraudulent, oppressive and intended to injure CARLIN. Consequently, CARLIN is entitled to an award of punitive damages.

SEVENTH CAUSE OF ACTION

(FRAUD – PROMISE MADE WITHOUT THE INTENT TO PERFORM

Against Defendants FGW, Frederic, Corporations and Does 1 to 50,

Inclusive)

85. CARLIN realleges and incorporates by reference the allegations contained in Paragraphs 1 through 84, Inclusive as though fully set forth herein.

86. Defendants Frederic, FGW, and the corporations, promised CARLIN he would be compensated for his 50% share of the net profits of the show, and for his services on the production as hereinabove alleged, if he would provide to these Defendants his ideas, intellectual property, contract rights, introduction to George and Simona Papadopoulos and all other components of the Production.

87. CARLIN is informed and believes that at the time Defendants FGW, Frederic and the Corporations, or any of its representatives, made the promise to CARLIN, each had no intention of performing it.

88. The promises were made by these Defendants with the intent to induce CARLIN to disclose his confidential ideas for the show, give them access to his intellectual properties, secure contract rights for the show through him, and access to George and Simona Papadopoulos, as well as CARLIN's work and research for creation of episodes, all with the promise that his written contract would be provided to him in accordance with these promises and assurances.

89. CARLIN at the time these promises were made and at the time he took the actions herein alleged, was ignorant of these Defendants' secret intention not to

-22-

perform, as these Defendants pretended to act in accordance with their promises to compensate him until they had obtained his confidential disclosure of the entire production concept, his intellectual properties, and the talent. In reliance upon the promises of these Defendants, CARLIN disclosed the basis of the production, provided services and use of his intellectual properties, and introduced Defendants to George and Simona Papadopoulos, permitting production and working on the actual filming until he was frozen out of the show, and all other acts as hereinabove alleged. If CARLIN had known of the actual intention of the Defendants, CARLIN would not have disclosed or shared the components of the Production he had developed with Defendants FGW, the Corporations or Frederic.

90.     Defendants FGW, the Corporations and Frederic failed to abide by their promises, terminated CARLIN from the show, excluded him from further production and filming, interfered with his relationship with Defendant Papadopoulos, refused to provide him with the promised contracts and refuses to compensate him as promised. But for CARLIN's termination and exclusion from the production and filming, CARLIN would have continued to perform his duties as a producer of the show, and development of the episodes and all other duties.

91. As a proximate result of the fraudulent conduct of the Defendants Frederic, FGW, the Corporations and Does 1 to 50, Inclusive, as herein alleged, CARLIN was induced to disclose a year's worth of research and work, divulge confidential information about the production, perform work on the production and introduce the talent to the Defendants; as well as work full time for over a month, 6 days a week without any compensation while expecting to be paid and for payment for his rights in the production, and has received no profit or other compensation for his time and energy, and loss of creative control over the production and his rights to a profit share, by reason of which CARLIN has been damaged in an amount to be proven at time of trial.

COMPLAINT

92. The aforementioned conduct of the Defendant Frederic, FGW, the Corporations and Does 1 to 50, Inclusive, were intentional promised made without the intent to perform, and hence an intentional misrepresentation, deceit, or concealment of a material fact known to these Defendants with the intention on the part of these Defendant of thereby depriving the CARLIN of property or legal rights or otherwise causing injury, and was despicable conduct that subjected CARLIN to a cruel and unjust hardship in conscious disregard of the plaintiff's rights, so as to justify an award of exemplary and punitive damages.

## EIGHTH CAUSE OF ACTION

(FRAUD - Deceit Against Defendants FGW, Frederic, Corporations and Does 1 to 50, Inclusive)

93.    CARLIN realleges and incorporates by reference the allegations contained in Paragraphs 1 through 84, Inclusive as though fully set forth herein.

94.    CARLIN is informed and believes that Defendant Frederic, who made the representations as herein alleged, is the managing member, officer, principal, owner or otherwise an authorized representative of the remaining Defendants FGW, the suspended Corporations, and Does 1 through 50, Inclusive, and at the time of making the representations as herein alleged and at all times herein mentioned was acting within the course and scope of her employment and/or authority for Defendants FGW, the suspended Corporations and Does 1 to 50, Inclusive, which Defendants had actual knowledge of her conduct.

95.    Commencing on or about November of 2018, Defendant Frederic and other representatives of Defendants FGW and the suspended Corporations made the following representations to CARLIN:

(a)  That Defendants would honor his Agreement with Defendant Papadopoulos for his 50% equity share;

(b) That Defendants would not interfere with his relationship with George and Simona Papadopoulos;

-24-

1       (c) That CARLIN was a partner with the remaining Defendants on the show;

2       (d) That CARLIN would be credited as the producer of the show, and would

3           participate throughout the production;

4       (e) That CARLIN would be paid for his services during filming and on the

5           production, and reimbursed for his expenses;

6       (f) That CARLIN would get a written contract on or about November 24,

7           2018, to protect his rights.

8     96. The representations made by Defendant Frederic, on behalf of Defendants

9 FGW, the Corporations and Does 1 to 50, Inclusive, were in fact false, the true facts

10 were:

11       (g) Defendants presented a contract with only a 2% equity share, which

12           would never have to be paid under the terms of the contract (Exhibit "C"),

13           and had not intention of paying CARLIN;

14       (h) Defendants cultivated a relationship with the Papadopolous' in an effort to

15           separate CARLIN from the talent for this show such that CARLIN has

16           been excluded from and has no contact with them;

17       (i) That Defendants never intended for CARLIN to be a partner for the show;

18       (j) That Defendants did not intent to include CARLIN as the show producer,

19           but only as an executive co-producer credit with no management authority,

20           and excluded him from the filming of the production;

21       (k) That Defendants never intended to pay CARLIN for his work on the

22           production and then excluded him from the production and failed to pay

23           tendered expense;

24       (l) That Defendants did not provide CARLIN with any proposed written

25           contract until after they had stolen the project, and only then a fraction of

26           the amounts promised with no protection for his rights.

27     97. When Defendant Frederic made these representations, she knew them to be

28 false and made these representations in the manner alleged, and with the expectation

1  that she could have CARLIN so act, and she could gain the opportunity to take over

2  the show from him.

3     98.  CARLIN, at the time these representations were made by Defendant

4  Frederic as herein alleged, and at the time the CARLIN took the actions herein

5  alleged, was ignorant of the falsity of the Defendant Frederic's representations and

6  believed them to be true. In reliance on these representations, CARLIN was induced

7  to and did perform services and divulge confidential information to the Defendants

8  as alleged hereinabove.  Had CARLIN known the actual facts, he would not have

9  taken such action. The plaintiff's reliance on the defendant's representations was

10 justified because he had no reason to suspect Defendants' secret intentions, and

11 expected them to perform as is standard in the entertainment industry.

12    99.  As a proximate result of the fraudulent conduct of the Defendants Frederic,

13 FGW, the Corporations and Does 1 to 50, Inclusive, as herein alleged, CARLIN was

14 induced to disclose a year's worth of research and work, divulge confidential

15 information about the production, perform work on the production and introduce the

16 talent to the Defendants;  as well as work full time for over a month, 6 days a week

17 without any compensation while expecting to be paid and for payment for his rights

18 in the production, and has received no profit or other compensation for his time and

19 energy, and loss of creative control over the production and his rights to a profit

20 share, by reason of which CARLIN has been damaged in an amount to be proven at

21 time of trial.

22    100.    The aforementioned conduct of the Defendant Frederic, FGW, the

23 Corporations and Does 1 to 50, Inclusive, was an intentional misrepresentation,

24 deceit, or concealment of a material fact known to these Defendants with the

25 intention on the part of these Defendant of thereby depriving the CARLIN of

26 property or legal rights or otherwise causing injury, and was despicable conduct that

27 subjected CARLIN to a cruel and unjust hardship in conscious disregard of the

28 plaintiff's rights, so as to justify an award of exemplary and punitive damages.

-26-

1   Defendant Papadopoulos, or his rights to credits on the production, which will
2   constitute great and irreparable injury.

3       105.   CARLIN has no adequate remedy at law for the injuries currently being
4   suffered from his exclusion from management and participation in the creative
5   process and the show, and which are threatened if the show is released whereby his
6   rights will be seriously impacted.  It will be impossible for CARLIN to determine
7   the precise amount of damage that he will suffer if Defendants' conduct is not
8   restrained, as Defendants have forced control over the entire show, and if CARLIN
9   is forced to institute a multiplicity of suits to obtain adequate compensation for his
10  injuries for each public release of the production by Defendants.

11      106.   As a proximate result of Defendants' wrongful conduct, CARLIN's
12  property or business interests in the show has been damaged in an amount according
13  to proof at trial, or upon an accounting with the profits held in a blocked court
14  supervised account, for as defendants' conduct continues. The full amount of this
15  damage is not now known to CARLIN, and CARLIN will amend this complaint to
16  state this amount when it becomes known to him or on proof of the damages.

17                  TENTH CAUSE OF ACTION – ACCOUNTING
18                         (Against all Defendants)

19      107.   CARLIN realleges and incorporates by reference the allegations
20  contained in Paragraphs 1 through 98, Inclusive as though fully set forth herein.

21      108.   CARLIN is the owner of those rights as hereinabove alleged in the
22  subject Production.  Defendants, and each of them, agreed and promised to pay
23  CARLIN his share of the net profits under the terms of his Agreement with
24  Defendant Papadopoulos reasonably approximating 50% of the net profits of the
25  subject Production, as well as the reasonable value of his services to the Production
26  and his expenses incurred.

27      109.   CARLIN is informed and believes that Defendants, and each of them,
28  have or will produce the subject show, which will be released to and exhibited to the

-28-
COMPLAINT

1   public, and when that happens, CARLIN's copyright protections will be violated,

2   and defendants will receive profits far in excess of the costs of the production, a

3   portion of which will be due and owing to CARLIN.

4        110.   The exact amounts of money to be received by Defendants and the

5   exact costs of production are unknown to CARLIN and can be determined only by

6   an accounting.

7        111.   CARLIN hereby demands an accounting by Defendants of the costs of

8   production and the amounts received as a result of the production of the show, and

9   that Defendants pay CARLIN his share of all profits realized.  Defendants, and each

10  of them, fail and refuse, and continue to fail and refuse to render an accounting or to

11  pay CARLIN the sums due him.

12       112.   CARLIN further requests that all profits from the show or the

13  Production, be placed in a blocked account supervised by the Court until proper

14  accounting is made.

15                          **PRAYER FOR RELIEF**

16       WHEREFORE, CARLIN prays for judgment against defendants, and each of

17  them, as follows:

18       ON THE FIRST, FIFTH, SIXTH, SEVENTH, EIGHTH Causes of Action

19  against Defendants Frederic, FGW, the Corporations and Does 1 to 50, Inclusive:

20       1.  For general and compensatory damages sustained by CARLIN according

21  to proof;

22       2.  For special damages sustained by CARLIN according to proof;

23       3.  For lost profits sustained by CARLIN according to proof;

24       4.  For disgorgement to CARLIN of defendants' profits from their breaches

25  described herein according to proof.

26       5.  For punitive and exemplary damages.

27       ON THE SECOND AND THIRD CAUSES OF ACTION Against Frederic,

28  FGW, the Corporations and Does 1 to 50, Inclusive:

-29-

COMPLAINT

6. For general and compensatory damages according to proof;

7. For special damages according to proof;

ON THE FOURTH CAUSE OF ACTION Against Defendant Papadopoulos:

8. For general and compensatory damages according to proof:

9. For special damages according to proof;

ON THE NINTH CAUSE OF ACTION FOR INJUNCTION Against all Defendants:

10. For an order requiring Defendants to show cause, if any they have, why they should not be enjoined as set forth in this complaint, during the pendency of this action from the media release of the docuseries or subject production;

11. For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining Defendants, and each of them, and their agents, servants, and employees, and all persons acting under, in concert with, or for them:

a. From their unauthorized disclosure, copying, reproducing, distributing or publicly displaying (1) the Production, (2) any and all products and/or series based upon the Production (including without limitation "Crossfire Hurricane," "Simona & George Papadopoulos" or the show based thereon) and (3) inducing, causing, materially contributing to and profiting from the foregoing acts committed by others.

b. For an order that defendants destroy all material of every nature and kind, in their possession, custody or control, that are based upon the Production; and to account for all profits from or derived in any way from the Production.

12. For damages according to proof and in such further sums as may be sustained and as are ascertained before final judgment in this action;

13. For restitution in the amount of the benefit to defendants from their breaches described herein.

ON ALL CAUSES OF ACTION:

12. For an accounting;

COMPLAINT

1    13. For costs of suit incurred in this action and reasonable attorneys' fees;

2    14. For prejudgment interest;

3    15. For such other and further relief as the court deems proper.

4

5    Dated:  May _____, 2019                    By _____

6                                                   DONNA BULLOCK, Attorney for
                                                    Plaintiff MICHAEL DOUGLAS CARLIN
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27          EXHIBIT 'A'
28

COMPLAINT

Yahoo Mail - Agreement

## Agreement

From:   Michael Douglas Carlin (michaeldouglascarlin@gmail.com)

To:     donnabullockcarrera@yahoo.com; oceancigar123@yahoo.com

Date:   Sunday, December 16, 2018, 6:26 PM PST

The following shall constitute Agreement by and between Simona Mangiante Papadopoulos on the one hand and Michael Douglas Carlin on the other hand regarding a film tentatively entitled "Crossfire Hurricane."

The scope the film will detail the events in the Trump Campaign that led to appointment of a Special Counsel and how these events impacted the lives of George & Simona. Great depth on some of the characters in this story will include but not be limited to Joseph Mifsud, Alexander Downer, and Stefan Halper to put this entire story into context of the political climate.

The distribution of the film is anticipated to be primarily on digital platforms but there is a possibility of attracting bigger distribution in theaters or television networks. At a minimum Amazon, and Google will be sought either directly or through an aggregator. Other digital platforms may include iTunes and Netflix.

Revenue from distribution on the film "Gross Proceeds" will be split on an equal basis. It is anticipated that agents, producers, and other personnel that help with the film may also share in the revenue but that shall be paid by the Carlin side of the Gross Proceeds. Simona will be responsible to pay her own agent out of her 50% share of the Gross Proceeds if appropriate.

Simona will hold entirely the intellectual property rights on their story.

This Agreement entered into this 31st Day of October, 2018 and includes the entire Agreement. A more formal Agreement may be drafted but unless or until agreed upon in writing this Agreement shall serve as the complete understanding between the parties.

Agreed to and Accepted by:

_Simona Mangiante Papadopoulos_
Simona Mangiante Papadopoulos

_Michael Carlin_
Michael Douglas Carlin

33

1/2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT "B"

-34-

COMPLAINT

# EXCLUSIVE PRODUCTION SHOPPING AGREEMENT



THIS AGREEMENT, made November 12, 2018, by and between Stephanie Frederic (hereinafter referred to as "Producer"), with her principal residence at 10445 Wilshire Blvd. Suite 702, Los Angeles, CA 90024, and George & Simona Papadopoulos (hereinafter referred to as "Talent"), located at _____ [address]. It is understood that Talent and Producer enter into an exclusive Shopping Agreement as defined herein; and that Producer, by reason of Producer's contacts, experience and background, is qualified to represent Talent's interest in procuring offers to enter into Purchase Agreement. Therefore, Talent and Producer agree as follows:

1.    **SCOPE OF AGREEMENT.** Talent hereby engages Producer during the term hereof to exclusively produce, represent, advise and solicit offers for the rights to the original, unpublished limited reality series entitled "The Papadopoulos Story/TBD" (herein called "Property") written by Talent and Producer, which shall include FGW Productions LLC, collectively referred to as "Production Company".

2.    **REPRESENTATION.** This agreement is limited solely to Producer's solicitation of offers on Talent's behalf for the purpose of procuring an offer to enter a Purchase Agreement. This Agreement also governs the negotiation of a Purchase Agreement or other legal matters that may arise from time to time. "Negotiation" or "Negotiations" is defined as the conducting of communications and/or conferences resulting from an offer to enter into a Purchase Agreement.

3.    **TERM.**

    a.   The term of this Agreement shall be for a period of six (6) months commencing on the date hereof.

    b.   If Producer is engaged in negotiations with a cable television, broadcast television and/or streaming platform (herein called "Distributor") during which time this Agreement would otherwise terminate, then, upon written notice given by Producer, prior to the termination hereof, this Agreement shall be extended for a reasonable period of time, not to exceed six (6) months, to conclude said negotiations. In the event Producer brings Talent an offer from a Distributor, Talent agrees to promptly enter into good faith negotiations with the Producer until the Producer's negotiations are completed and a Purchase Agreement is signed by the parties thereto or until the negotiations cease.

    c.   Producer will keep Talent fully informed about all solicitations. Producer will send to Talent a list of all solicited Distributors and copies of all correspondence relating to the solicitations conducted in connection with this Shopping Agreement.

## EXCLUSIVE PRODUCTION SHOPPING AGREEMENT

4. **DERIVATIVE WORK.**

    a. Producer and Production Company shall have first right of refusal to all derivative work to all types of derivative works, hereafter devised, including spin-offs, remakes, theatrical features, series, non-theatrical, home-video, mobile technology, or video-on-demand.

5. **FEES AND EXPENSES.**

    a. Fees and expenses shall be detailed in a separate Production Agreement, between the Producer and Talent.

6. **COMPENSATION.**

    a. Talent's compensation for the Property will be negotiated in a separate Production Agreement, by the Talent and the Talent's representation.

    b. Producer's compensation for services will be negotiated in a separate Production Agreement, by the Producer and the Producer's representation.

7.     **MUTUAL WARRANTIES AND REPRESENTATIONS.** Both parties warrant and represent that no act or omission hereunder will violate any right or interest of any person of firms or will subject the other party to any liability or claim of liability to any person. Both parties warrant that they are under no disability, restriction or prohibition with respect to their rights to execute this Agreement and perform its terms and conditions. Both parties agree to indemnify the other party and to hold the other party harmless against any damages, costs, expenses, fees (including attorney's fees) incurred by the other party in any claim, suit or proceeding instituted against the other party in which any assertion is made which is inconsistent with any warranty, representation or covenant of that party. A party's obligation to indemnify shall be conditioned upon the prompt notice of an asserted claim for which indemnification may be sought and upon that party's right to intervene and participate, at its own expense, in defense of the claim.

8.     **NEW MEMBER.** In the event that at any time hereafter a new member is intended to be added, Talent shall immediately inform any such prospective additional member of this Agreement of all of its terms and shall immediately inform Producer of the name and address of any additional member and shall immediately cause such additional member to execute this Shopping Agreement.

9.     **MISCELLANEOUS.**

    a. Talent and Producer each acknowledge that they have carefully read this Agreement and that they fully understand its contents.

    b. There shall be no change, amendment or modification of this Agreement unless it is reduced to writing and signed by all parties hereto.

    c. No waiver or any breach of this Agreement shall be construed as a continuing waiver or consent to any subsequent breach hereof.

## EXCLUSIVE PRODUCTION SHOPPING AGREEMENT

d. This Agreement does not and shall not be construed to create a partnership or joint venture between the parties hereto.

e. This Agreement shall be construed in accordance with the laws of the State of California governing contracts wholly executed and performed therein, and the parties hereto agree to submit to the jurisdiction of the Courts of the State of California and that service of process may be made by certified mail in lieu of personal service thereof.

f. This Agreement shall be binding upon and inure to the benefit of the parties' respective heirs, executors and successors.

g. In the event any provision hereof shall be for any reason illegal or unenforceable, the same shall not affect the validity or enforceability of the remaining provisions hereof,

IN WITNESS WHEREOF, the parties hereto have executed this Shopping Agreement the day and year first above written.


**TALENT:**


_____          _____
George Papadopoulos                       Simona Papadopoulos


Date: _____            Date: _____


**PRODUCER:**


_____
Stephanie Frederic – FGW Productions LLC


Date: _____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27 EXHIBIT "C"
28

COMPLAINT

AS OF:                  November 30, 2018                    *Exhibit "A"*
                                                            *Page 1*
PROJECT:                *"Untitled GSP"*
CO-EXECUTIVE
PRODUCER:               Michael Douglas Carlin

NOTICE &                Michael Douglas Carlin
PAYMENTS:               1901 Ave of the Stars, 2nd floor
                        Century City, CA 90067


The following sets forth the terms and conditions of the agreement ("Agreement") between FGW
Productions LLC ("Company") and Michael Douglas Carlin ("Co-EP") for the project currently
entitled *"Untitled GSP"* ("Project"), based on the real life events of George and Simona
Papadopoulos ("Story").

1.  Development:

    (a)  Development and Supervisory Services: Commencing on the date hereof, Company
         employs Co-EP as Co-Executive Producer of the Project to render all customary development
         services rendered by producers in Los Angeles, California and any additional services reasonably
         required by the Company in connection therewith. Co-EP accepts such engagement and agrees to
         render all development services hereunder on a non-exclusive but first priority and regular in-
         person basis. Development services shall commence on the date hereof and shall continue until
         the completion thereof as required by Company or until abandonment of the Project or until the
         Project is "set for production" (as defined below), whichever occurs first.

    (b)  Abandonment of Development: At any time, the Company may abandon the development
         of the Project, subject to the Company's rights hereunder, at law and in equity. Abandonment
         shall occur, or be deemed to have occurred, only if and when the Company gives written notice
         of its election to abandon, or as otherwise specifically provided for in subparagraph 1(c). If the
         Company abandons the development of the Project prior to employing the production services of
         the Co-EP, the Turnaround Provisions of Exhibit "1A" shall be in effect and shall govern the
         rights and obligations of the parties with respect to the Project.

    (c)  Non-Circumvent Agreement: The Co-EP is required to sign a Non-Circumvent, or Non-
         Disclosure, Agreement, immediately before proceeding with photography activities.

    (d)  Protecting the Integrity of the Project: All still photographs, videos, etc., must be
         immediately returned to the Company in effort to protect the integrity of the Project.
         Withholding any photographs and videos will terminate the Producer Agreement effective
         immediately

2.  Production:

    (a)  Engagement/Exclusivity: If Company elects to employ Co-EP to render production
         services as the producer of the Project upon the terms hereof, Co-EP shall render all customary
         production services rendered by producers in Los Angeles, California and any additional services
         reasonably required by the Company in connection therewith.

including those involving artistic taste and judgment. Without limiting the generality of the foregoing:

    i.   Co-EP shall not make any material changes in the final shooting of the Project, or in the shooting schedule or budget, without Company's specified written approval in each case.

    ii.   Co-EP shall not make or authorize any firm commitment for services, rights, credits, facilities, equipment or materials, and shall not use, license or record any music for the Project, without Company's specific written consent in each case and all such services, rights, facilities, equipment, materials and music shall be contracted for by Company in Company's name.

    iii.   Company shall review and approve all script/storyline changes, artwork, dailies, sound recordings and other materials created in connection with the Project at such times and places as Company determines.

    iiii.   Co-EP shall fully comply with all of Company's legal clearance procedures with respect to the content of the Project including, but not limited to, clearance of script/storyline, props, set dressing and other visual elements.

    v.   Co-EP shall not arrange for placement of products in the Project without consent of Company.

    vi.   Co-EP agrees that the use of alcohol and/or drugs during production hours is prohibited and will result in immediate termination.

(c)   <u>Further Services</u>: If, after the expiration or termination hereof, Company requires further services of Co-EP for retakes, added scenes, visual effects, looping, post-synching, publicity interviews, personal appearances, stills and similar services, Co-EP shall render such services, subject to Co-EP's next professional availability.

(d)   <u>Disposition of Assets</u>: Everything purchased, built, designed or created for the Project (including, by way of example but without limitation, props, set dressing, set pieces, wardrobe, vehicles, equipment and supplies of all kinds, and original artwork such as sketches, storyboards, renderings, models and blueprints) shall at all times be deemed assets of the Company. Co-EP shall not sell, give away, promise or otherwise dispose of any such assets without the prior written approval of Company's senior management. At or before wrap all assets are to be inventoried and returned to Company. Any disposition of assets by Co-EP contrary to the foregoing shall constitute a breach of this Agreement.

3.   <u>Compensation</u>:  Subject to Paragraphs 7 and 11 hereof, Co-EP is not in material default hereunder, Company shall pay Co-EP the following compensation:

(a)   <u>Fixed Compensation</u>: Company agrees to allot Co-EP $50 (fifty US dollars) per diem, per day, while filming outside of the State of California:

(b)   <u>Contingent Compensation</u>: Upon completion of sale of the Project, and reimbursement of investor's investment plus ROI (return on investment), Company agrees to allot 2.5% (two point five percent) of 100% (one hundred percent) of the Project's net profits.

4.   <u>Transportation and Expenses/Additional Benefits</u>:

(a)   <u>General</u>: If Co-EP's principal residence is more than 50 miles from a location where Company requires production services ("overnight location"), Company shall furnish and pay for: (i) round-trip transportation, first class if available, by air if appropriate, between such residence (or from wherever Co-EP then may be, if closer) and where such services are required; and (ii) all reasonable pre-approved living expenses. Company's obligation to reimburse Co-EP for transportation and living expenses shall be subject to Company's usual expense accounting procedures.

*(handwritten, right margin)* Exhibit "A" Page 2

(a)  Personal Credit.  As producer substantially in the form "Co-Executive Producer:".

(i)   On the screen in all positive prints of the Project, on a separate card (shared only with other persons receiving credit in the same capacity).

*Exhibit "A" Page 3*

6.  Rights:

(a)   Ownership:  All results and proceeds of every kind of the services heretofore and hereafter to be rendered by Co-EP in connection with the Project, including without limitation all ideas, suggestions, themes, plots, stories, characterizations, all footage filmed while on-set and locations, dialogue, titles and other material, whether in writing or not in writing, at any time heretofore or hereafter created or contributed by Co-EP which in any way relate to the Project or to the material on which the Project will be based (collectively, "Material"), are and shall be deemed to be works made for hire for Company. Accordingly, Company is and shall be considered the author and, at all stages of completion, the sole and exclusive owner of the Material and all right, title and interest therein (the "Rights"). The Rights shall include without limitation all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in the Material now or hereafter recognized in any and all territories and jurisdictions including, by way of illustration, production, reproduction, distribution, adaptation, performance, fixation, rental and lending rights, exhibition, broadcast and all other rights of communication to the public, and the right to exploit the Material throughout the universe in perpetuity in all media, markets and languages and in any manner now known or hereafter devised.  If under any applicable law the fact that the Material is a work made for hire is not effective to place authorship and ownership of the Material and the Project and all rights therein in Company, then to the fullest extent allowable and for the full term of protection otherwise accorded to Co-EP under such applicable law, Co-EP hereby assigns and transfers to Company the Rights and, in connection therewith, any and all right, title and interest of Co-EP in the Project and any other works now or hereafter created containing the Material.

(b)   Alteration Rights:  Company has sole and exclusive right to change, add to, take from, translate, reformat or reprocess the Material in any manner Company may in its sole discretion determine. To the fullest extent allowable under any applicable law, Co-EP hereby irrevocably waives or assigns to Company Co-EP's so-called "moral rights" or "droit moral".  Co-EP expressly acknowledges that many parties will contribute to the Project and other works that will embody all or part of the Material. Accordingly, if under any applicable law the above waiver or assignment by Co-EP of "moral rights" or "droit moral" is not effective, then Co-EP agrees to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

(c)   Additional Documents:  Co-EP will upon request execute, acknowledge and deliver to Company any and all documents Company may deem necessary to evidence and effectuate all or any of Company's rights under this Agreement.

(d)   Name and Likeness:  Co-EP grants to Company the right to issue and authorize publicity concerning Co-EP, and to use Co-EP's name, voice, likeness and biographical data in connection with the distribution, exhibition, advertising and other exploitation of the Project. Without limiting the foregoing, Company may use Co-EP's name, voice, likeness and biographical data in connection with publications, merchandise, commercial tie-ins, and goods and services of every kind if reference is made to the Project or the literary property or screenplay upon which the Project is based, or any part thereof, or to Co-EP's engagement hereunder, and if Co-EP is not represented as using or endorsing any such item.  Co-EP will not at any time issue or authorize publicity or disclose any confidential information relating to this engagement or the Project or Company (as distinguished from personal publicity relating solely to Co-EP) to the press or media without Company's written consent in each case.

7.  No Obligation to Proceed:

41

release, distribute or otherwise exploit the Project, or to exercise any or all of Company's rights under this Agreement, or to continue any of the foregoing if commenced.



8. <u>Services Unique</u>: Co-EP's services and the rights granted Company under this Agreement are of a special, unique, unusual, extraordinary and intellectual character giving them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in any action at law. A breach hereof by Co-EP shall cause Company irreparable injury and Company shall be entitled to injunctive and other equitable relief to secure enforcement of this Agreement, but resort to such relief shall not waive Company's other rights.

9. <u>Representations and Warranties</u>: Co-EP represents, warrants and agrees that: Co-EP is free to enter into this Agreement and grant all rights herein granted and make all agreements made by Co-EP and Co-EP is not subject to any conflicting obligation or disability which will or might prevent or interfere with the execution of this Agreement by Co-EP and the performance of Co-EP's services.

10. <u>Indemnification</u>:

(a) <u>General</u>: Co-EP shall indemnify Company against any and all liability, damages, costs and expenses, including reasonable attorneys' fees and costs, in connection with any third party claim or action arising out of the breach of any of Co-EP's representations, warranties and agreements herein. Company shall indemnify and defend Co-EP against any and all liability, damages, costs and expenses, including reasonable attorneys' fees and costs, in connection with any third party claim or action (other than those arising out of a breach of Co-EP's representations, warranties or agreements hereunder or out of any criminal misconduct or malicious or tortious acts by Co-EP) respecting material supplied to Co-EP by Company or incorporated into the Project by employees or officers of Company other than Co-EP, or in connection with Co-EP's development, production, distribution or exploitation of the Project.

(b) <u>Notice of Claim</u>: Company and Co-EP shall, upon presentation of any claim or institution of any action covered by the foregoing indemnity provision, promptly notify the other of the presentation of such claim or the institution of such action, giving full details thereof. The indemnified party shall cooperate (without being required to incur any costs or expenses) in the defense of any claim for which indemnification is provided hereunder.

11. <u>Contingencies</u>:

(a) <u>Suspension</u>: Notwithstanding any other provision of this Agreement, Co-EP's services, the accrual of Co-EP's compensation, and the running of any periods provided for herein shall be suspended without notice during the periods specified below.

(i) All periods that Co-EP does not render services hereunder because of illness, incapacity or default.

(ii) All periods that development or production of the Project is prevented, hampered or interrupted because of force majeure events (e.g. any labor dispute, fire, theft, act of God, war, governmental action, injunction or other material interference with Company's development, production or distribution of the Project, third party breach of contract, death, illness or incapacity of the director, director of photography or a principal member of the cast or any other event beyond Company's control).

(iii) All dates set forth or provided for herein shall be postponed for a period equivalent to the period of such event and for such additional time as is reasonably necessary for Co-EP to recommence its usual business operations. Company may lift any suspension and reimpose it for the same force majeure event.

(i)   If Co-EP does not render services hereunder because of illness or incapacity for 5 consecutive days or 10 days or more in the aggregate during the period Co-EP is required to render exclusive services, or for 10 consecutive days or 14 days in the aggregate at other times hereunder.

(ii)   If a force majeure event continues for 8 weeks or more, or in the event Company shall have lifted any force majeure suspension and reimposed it for the same event, then if such suspensions continue for 8 weeks or more in the aggregate.

(iii)   Any refusal to perform or supply Co-EP's services.

(iiii)   Any other material default by Co-EP which remains uncured for 24 hours after Company's notice thereof; provided, however, that for repeated defaults of the same nature Co-EP shall have no opportunity to cure.

Upon any such termination, the payment of the fixed compensation which has accrued under subparagraphs 3(a) and 3(b) as of the date of termination shall constitute full payment by Company for all services rendered and rights granted to Company hereunder, subject to Company's rights hereunder, at law and in equity.

12.   Insurance:

(a)   General Liability/E&O Insurance:   Co-EP shall be insured by the errors and omissions and general liability insurance policies for the Project to the extent that Company obtains and maintains such policies and shall be subject to the terms, conditions and restrictions of such policies and endorsements thereto.

13.   Payments:

(a)   General:   All compensation payable hereunder on a weekly basis shall be payable not later than Friday of each week for the period ending on the preceding Saturday. Payments for any period of less than a week shall be at a daily rate determined by prorating the weekly rate on the basis of the number of days in the normal work week at the time and place involved, subject to applicable collective bargaining agreements. No additional payments shall be required for services rendered at night or on Sundays, Saturdays or holidays or for meal delays, hazardous work, violation of rest periods, or otherwise, or for exhibitions of the Project on television or in supplemental markets. All payments hereunder shall be made at Company's office in Dallas/Fort Worth, Texas. All money payable hereunder shall be payable only if Co-EP has executed and delivered this Agreement and fully complied with all of Co-EP's obligations hereunder.

14.   Assignment:   Company may assign this Agreement or loan or furnish Co-EP's services to any parent, subsidiary or affiliated corporation of Company, or to any entity with or into which Company merges or consolidates, or which succeeds to all or a substantial portion of Company's assets, or to any entity which produces the Project for release and distribution by Company or which supplies financing or studio facilities for the Project, or which has the right to distribute the Project, or which may be or become the owner of the Project or of the underlying literary property and screenplay. Company may assign and/or license any of its rights to the Material and/or to use Co-EP's name, likeness and biographical data, and all representations and warranties hereunder, to any entity whatsoever, and this Agreement shall inure to the benefit of all such assignees and licensees. No such assignment or license shall relieve Co-EP of its obligations hereunder unless the assignee is a "major" producer or distributor of television network (as those terms are commonly understood in the television industries at the time) or other financially responsible party, or if Co-EP approves of such assignment or license, and if such assignee or licensee assumes in writing Company's obligations hereunder.

(a)   Notices:  All written notices which either party hereto is required or may desire to give to the other shall be given by delivering or mailing the same to the other at the address shown on the face hereof, or at such other address as may be designated in writing by any such party in a notice to the other given as aforesaid.  Notices to Company shall be addressed to the specific attention of Stephanie Frederic c/o FGW Productions LLC – 10850 Wilshire Blvd. Suite 230| Los Angeles, CA  90024. Notices shall be sufficiently given when hand-delivered or when the same shall be deposited so addressed, postage prepaid, in the United States mail and/or when the same shall have been transmitted by facsimile or similar means and the date of said delivery or transmission, or 3 days after the date of said mailing, shall be deemed to be the date of the giving of such notice.

(b)   Governing Law/Dispute Resolution:  This Agreement shall be governed and construed in accordance with the laws of the State of California applicable to contracts entered into and fully performed therein. Any and all controversies, claims or disputes arising out of or related to this Agreement or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of state or federal statutory or common law rights or duties, and the determination of the scope or applicability of this agreement to arbitrate ("Dispute"), except as otherwise set forth below, shall be resolved according to the following procedures which shall constitute the sole dispute resolution mechanism hereunder.  In the event that the parties are unable to resolve any Dispute informally, then such Dispute shall be submitted to final and binding arbitration.  The arbitration shall be initiated and conducted according to either the JAMS Streamlined (for claims under $250,000) or the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures, except as modified herein, including the Optional Appeal Procedure, at the Los Angeles office of JAMS, or its successor ("JAMS") in effect at the time the request for arbitration is made (the "Arbitration Rules"). The arbitration shall be conducted in Los Angeles County before a single neutral arbitrator appointed in accordance with the Arbitration Rules.  The arbitrator shall follow California law and the Federal Rules of Evidence in adjudicating the Dispute. The parties waive the right to seek punitive damages and the arbitrator shall have no authority to award such damages.

The arbitrator will provide a detailed written statement of decision, which will be part of the arbitration award and admissible in any judicial proceeding to confirm, correct or vacate the award. Unless the parties agree otherwise, the neutral arbitrator and the members of any appeal panel shall be former or retired judges or justices of any California state or federal court with experience in matters involving the entertainment industry. If either party refuses to perform any or all of its obligations under the final arbitration award (following appeal, if applicable) within thirty (30) days of such award being rendered, then the other party may enforce the final award in any court of competent jurisdiction in Los Angeles County. The party seeking enforcement of any arbitration award shall be entitled to an award of all costs, fees and expenses, including attorneys' fees, incurred in enforcing the award, to be paid by the party against whom enforcement is ordered.

Notwithstanding the foregoing, either party shall be entitled to seek injunctive relief (unless otherwise precluded by any other provision of this Agreement) in the state and federal courts of Los Angeles County. Any Dispute or portion thereof, or any claim for a particular form of relief (not otherwise precluded by any other provision of this Agreement), that may not be arbitrated pursuant to applicable state or federal law may be heard only in a California court (state or federal) of competent jurisdiction in Los Angeles County. Any process in such proceeding may be served upon Co-EP by, among other methods, delivering it or mailing it, by registered or certified mail, directed to such address Co-EP designated in this Agreement. Any such delivery or mail service shall have the same effect as personal service within the State of California.

(c)   Relationship of The Parties:  This Agreement is not a partnership between or joint venture by the parties hereto and neither party is the agent of the other. This Agreement is not for the benefit of any third party, whether or not referred to herein. Captions and organization are for convenience only and shall not be used to construe meaning. A waiver of any breach shall not waive a prior or subsequent breach. All remedies shall be cumulative and pursuit of any one shall not waive any other. This Agreement may be signed in counterpart, each of which shall be deemed an original, but all of which together shall constitute the Agreement.

*Exhibit A Page 6*

44

The parties hereto have executed and delivered this Agreement as of the date first above written.

COMPANY:                                    CO-EXECUTIVE PRODUCER:

*Exhibit "A"*
*Page 7*

By: _____          By: _____
    Stephanie Fredario                     Michael Douglas Carlin

Its: FGW Productions LLC

7 of 9                                  Int___ Int___

45

## VERIFICATION

1 | 
2 |     I, MICHAEL DOUGLAS CARLIN, am the plaintiff in the above-entitled action. I have
3 | read the foregoing complaint and know its contents. The same is true of my own knowledge,
4 | except as to those matters that are alleged in the complaint on information and belief, and as to
5 | those matters, I believe them to be true.
6 | I declare under penalty of perjury under the laws of the State of California that the foregoing is
7 | true and correct.

Dated: April _____, 2019

By _____

MICHAEL DOUGLAS CARLIN, Plainti

46

COMPLAINT